## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **JOHN CARLOS BAILEY,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:15-CV-00811-KOB** |
| **CAROLYN W. COLVIN** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On December 14, 2011, the claimant, John Carlos Bailey, applied for disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act. (R. 140-143). The claimant alleged disability commencing on October 31, 2010, because of lumbar stenosis, lumbar degenerative disc disease, lumbar facet hypertrophy, lumbar radiculopathy, neuralgia, herniated disc C5-6 on the right, cervical spondylosis, thoracic spondylosis, chronic pain syndrome, generalized anxiety disorder, major depressive disorder, specific reading disorder, and disorder of written language. (R. 29, 140, 158). The Commissioner denied the claim on April 6, 2012. (R. 96). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on September 18, 2013. (R. 47, 104).

In a decision dated January 23, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 23-25). On March 17, 2015, the Appeals Council denied the claimant's request for review.

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1- 3). The claimant has exhausted his administrative remedies, and the court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

I.     Whether the ALJ failed to support with substantial evidence his decision to give little weight to the opinion of the claimant's treating physician, Dr. Duryea.

II.    Whether the ALJ, in applying the pain standard, lacked substantial evidence to discredit the claimant's pain testimony.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" 42

U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416,920.

The ALJ must state with particularity the weight given different medical opinions and the

reasons for them, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278,

279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The

ALJ must give the testimony of a treating physician substantial or considerable weight unless

"good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th

Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a

contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Where the ALJ fails to

articulate specific reasons for failing to give the opinion of a treating physician controlling

weight or those reasons are not supported by substantial evidence, the ALJ commits reversible

error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and *either* (1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will overturn a negative credibility finding that lacks supporting substantial evidence in the record. *Foote*, 67 F.3d at 1562.

Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20. C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id*.

## V. FACTS

The claimant was thirty-five years old at the time of the ALJ's final decision. (R. 43). The claimant completed education up to the eleventh grade and has past relevant work as a lineman, landscaper for a nursery, and a HVAC unit installer. (R. 92-93, 158). The claimant alleges disability based on lumbar stenosis, lumbar degenerative disc disease, lumbar facet hypertrophy, lumbar radiculopathy, neuralgia, herniated disc C5-6 on the right, cervical spondylosis, thoracic spondylosis, chronic pain syndrome, generalized anxiety disorder, major

depressive disorder, specific reading disorder, and disorder of written language. (R. 29, 140, 158). The claimant took Ambien for sleep and Oxycodone, OxyContin, and Trizandine for back pain. (R. 160).

Dr. Kathleen Duryea, D.O., of Harbin Medical Clinic and Centre Floyd Primary Care/Urgent Care, was the claimant's primary care physician from November 30, 2007, until the time of the hearing in September 2013. (R. 314-427).

On November 30, 2007, the claimant visited Dr. Duryea because he was not able to sleep, had anxiety issues when interacting at work, and had muscle spasms in his lower back and neck. Dr. Duryea prescribed him 10 mg of Zolpidem Tartrate for sleep problems. (R. 424-426).

The claimant visited Dr. Duryea on January 18, 2008 for lower back pain that ran into his legs. Dr. Duryea noted that his gait and stance were normal. He had normal movement in all extremities, but with tenderness on the right side of his spine.  Dr. Duryea diagnosed him with lumbago. Dr. Duryea prescribed the claimant 10-650mg of Hydrocodone-Acetaminophen, 10 mg of Diclofenac Sodium for pain relief, and 10 mg of Cyclobenzaprine HCl for muscle tightness. (R. 416-418). Dr. Duryea continued the claimant on this regimen without any major health changes until October of 2010. (R. 407-416).

On October 4, 2010, the claimant sought treatment at the Riverview Regional Medical Center Emergency Room for intense work-related back pain. The claimant described his pain as a ten out of ten. An X-ray showed mild L5-S1 Degenerative Disc Disease. (R. 203-205).

The claimant visited Dr. Duryea again on October 7, 2010 for back pain. Dr. Duryea noted that the claimant went to work on October 4 that week and collapsed because of back pain. The claimant told Dr. Duryea that he could not get up out of a chair and went to the emergency room for treatment several days before this visit. Dr. Duryea noted the claimant's loss of normal

lumbar lordosis, tenderness on palpitation of the iliolumbar region, and lumbosacral spine pain elicited by motion. (R. 369-371).

On October 15, 2010, Diagnostic Health performed an MRI that revealed degenerative disc desiccation at L4-L5, with a broad-based disc bulge and facet arthropathy with ligamentum flavum hypertrophy resulting in mild to moderate spinal canal stenosis.  The MRI also revealed degenerative disc desiccation at L5-S1, with a central disc protrusion and associated facet erthropathy resulting in moderate spinal canal stenosis. Disc protrusions at L4 and L5 caused spinal canal stenosis and foraminal narrowing. (R. 224).

The claimant sought treatment on November 1, 2010 with Dr. Edwin Stevens, M.D., of the Department of Neurosurgery at the Harbin Clinic, at the request of Dr. Duryea. Dr. Stevens noted that the claimant had a steady gait, good range of motion, good strength in all upper and lower extremities, and no obvious deformities in his motion or strength. Dr. Stevens noted that the claimant has had two episodes of excruciating lower back pain; stated that "certainly he is at risk for worsening lower back complaints with his early onset of degenerative changes"; and recommended staying with the current treatment plan and adding physical therapy. Dr. Stevens recommended against surgical intervention at this time because at 32 years-old the "lumbar fusion procedure would be an extremely morbid operation for him and change his back forever." (R. 214-215).

On November 5, 2010, the claimant visited Dr. Duryea for a follow-up on his neurology visit. Dr. Duryea noted that Dr. Stevens advised the claimant to find another line of work. Dr. Duryea noted that the claimant "needs to be put on short term disability." The claimant reported his pain was an eight out of ten. Dr. Duryea increased his Oxycodone from 15 mg to 30 mg. (R. 362-363).

Also on November 5, 2010, Dr. Duryea indicated on a Guardian Group Short Term Disability Claim form that the claimant suffered from Lumbar Canal Stenosis and could not climb; carry anything greater than ten pounds; climb ladders; drive under a CDL; stand greater than twenty minutes; or sit greater than 20 minutes.  (R. 444).

On November 23, 2010, the claimant saw Dr. Duryea for insomnia, anxiety, and lumbar stenosis. Dr. Duryea noted that the medications for the claimant's back pain were not effective. The claimant reported a pain level of seven out of ten. Dr. Duryea provided a work excuse for the claimant.  She also completed a Doctor's Certificate for the Unemployment Compensation Agency, indicating that the claimant was unable to perform the duties of his current job and could not perform any type of work at that time because of his lumbar disc degeneration and stenosis.  (R. 359-361, 444).

On December 3, 2010, the claimant visited Lemak Sports Medicine for worsening back pain when sitting, standing, turning, bending, and lifting. Dr. Stanford Faulkner, Jr. noted that he "would like to try to keep him by non-operatively," and that the claimant had an appointment with Dr. Paul Muratta for pain management. (R. 217-219).

The claimant sought treatment on December 20, 2010 with Dr. Muratta, who noted the claimant's pain with flexion of the lumbar spine and previous diagnoses of lumbar degenerative disk disease, lumbar facet hypertrophy, and neuralgia. Dr. Muratta prescribed the claimant 15 mg of Mobic for inflammation, 750 mg of Robaxin for back spasms, and 40 mg of Oxycontin for pain relief. (R. 228-229).

On December 21, 2010, the claimant visited Dr. Duryea for anxiety, insomnia, and lumbar disc degeneration. The claimant reported a pain level of nine out of ten. (R. 356-357). On that same date, Dr. Duryea completed a STD Attending Physician's Statement of Disability

for Guardian Life Insurance, stating that the claimant's lumbar canal stenosis prevented him from performing his current job and that his treatment plan included pain medications and injections.

On December 22, 2010, Dr. Muratta performed an electrodiagnostic exam[2] on the claimant and found that the claimant had severe diminished function in L1, the upper lumbar nerve; moderate diminished function in L2, the lateral femoral cutaneous nerve; and moderate diminished function in L3, the femoral cutaneous nerve. (R. 241).

Dr. Duryea saw the claimant on January 19, 2011 for anxiety, insomnia, and lumbar disc degeneration and reported a pain level of eight out of ten.  Dr. Duryea noted the claimant's medications were not effective. Dr. Duryea discontinued the claimant's 30 mg prescription of OxyCodone. (R. 353-355). The claimant returned on January 25, 2011 for Dr. Duryea to complete disability paperwork and again rated his pain at an eight out of ten.  (R. 351-352).

On March 1, 2011, the claimant followed up with Dr. Muratta at Lemak Sports Medicine.[3] The claimant rated his pain level a seven out of ten and reported his medications were twenty-five to thirty percent effective.  The claimant stated that his second caudal epidural steroid injection was ineffective at reducing any pain. Dr. Muratta added 15 mg of Roxicodone for pain relief and switched from Robaxin back to Zanaflex because of ineffectiveness. (R. 230).

On March 18, 2011, the claimant followed-up with Dr. Duryea regarding his insomnia. Dr. Duryea noted that the claimant's insomnia medications were effective and prescribed Chantix to help him quit smoking. (R. 348).

---

[2] This electrodiagnostic exam consisted of a lumbar plexus study of sensory conduction evaluation. Pathology in the pre-DRG fibers is detected by comparing the amplitude initiating A-delta conduction, signaled by ventral motor pathway EMG potentiation. Such measurements have 95% sensitivity. Bilateral testing, which is supported by AMA guidelines, allows the patient to be his own control, independent of age, gender, and population data. (R. 241).
[3] The record contains no medical records of the claimant's procedures with Lemak Sports Medicine prior to this follow-up appointment.

At another follow-up regarding his insomnia on April 11, 2011, Dr. Duryea noted that the claimant had "no change in the overall pain in [the claimant's] back or radiation into legs" and that the claimant "was unable to sit/stand/walk for more than twenty minutes." The claimant reported his pain level was a seven out of ten. (R. 345-347).

On April 13, 2011, Dr. Muratta conducted a lumbar select nerve root block on the claimant and an epidurogram on June 16, 2011, because of the claimant's unresponsiveness to previous interventions. (R. 231-232).

The claimant saw Dr. Duryea again on July, 15, 2011, for insomnia, lumbago, and anxiety. The claimant reported that he could not afford the copay for Chantix. Dr. Duryea noted that the claimant's gait and stance were normal. The claimant reported his pain was a six out of ten. Dr. Duryea provided the claimant a work excuse for the following three months. (R. 342-344).

On August 23, 2011, the claimant saw Dr. Muratta for a follow-up on his previous procedures. The claimant rated his pain a five out of ten and described it as a dull pain that increases with activity. The claimant reported that his medications were fifty to sixty percent effective. Dr. Muratta did not add or subtract any medication from the claimant's current regimen. (R. 233).

Dr. Duryea completed a "STD Attending Physican's Statement of Disability" for the claimant's Guradian Life Insurance disability benefits on September 21, 2011, stating that the claimant was totally disabled at that time from working at his current job because of his lumbar stenosis.  (R. 441).

The claimant reported to Dr. Duryea at a follow-up appointment on October 20, 2011 that his pain level was a six out of ten. Dr. Duryea did not note any new or worsening symptoms, but noted that the claimant had musculoskeletal symptoms. (R. 339-341).

On October 26, 2011, the claimant saw Dr. Muratta to follow up on his pain management. The claimant reported his pain level was a six out of ten, but indicated that his pain level increases with activity. The claimant reported that the caudal epidurals have not provided him any relief from his pain symptoms. The claimant reported that his medications were sixty percent effective. Dr. Muratta increased the claimant's Roxicodone prescription by 15 mg. (R. 234).

Dr. Muratta gave the claimant a facet joint injection for lower back pain on November 2, 2011. (R. 235).  At his follow-up appointment on December 27, 2011, the claimant reported that his pain was a six out of ten, but that his pain level increases with activity. The claimant reported his medications were sixty percent effective. (R. 236).

On January 4, 2012, Dr. Muratta gave the claimant another facet join injection for back pain. (R. 237).

The claimant's grandmother, Eunice Gregory, completed a third-party function report on January 9, 2012. She reported that the claimant does as little as he can, has trouble putting on his pants, and sometimes needs a shower chair to bathe. She reported that he can wash his own dishes, but does not do any other household chores. She also reported that the claimant goes to his daughter's basketball games once a month. She noted that the stress and pain of the claimant's condition worsen his depression. (R. 165-170).

On January 10, 2012, the claimant completed a function report, written by Louise Bailey because the claimant cannot spell and has difficulty reading. The claimant reported that each day

he eats breakfast and cleans his own plate; he watches television most of the day; and he takes a bath. The claimant reported that he must take medication to fall asleep; that he can drive some times, but is worried his legs will lock up; and that his condition has added greatly to his stress and depression, which has caused him to lose his wife and friends. (R. 173-180).

On February 4, 2012, the claimant reported to Dr. Duryea that his pain level was a five out of ten. Dr. Duryea did not note any new or worsening symptoms, but noted that the claimant had musculoskeletal symptoms. (R. 336-338).

Dr. Muratta gave the claimant a sacroiliac joint injection on February 6, 2012. (R. 434). At the follow-up appointment on February 22, 2012, the claimant reported his pain level as a six out of ten, with occasional sharp pain that increases with activity. Dr. Muratta added 10 mg of Valium and 50 mg of Ultram to the claimant's medication regimen to reduce pain. (R. 433).

On March 7, 2012, the claimant sought a consultative examination by Dr. June Nichols, Pys. D., with Gadsden Psychological Services, at the request of Disability Determination Services. The claimant stated that he had a friend drive him to the appointment because of his pain; he has pain in his back and both legs all the time; he cannot sit or stand for long; his "pain meds don't work very well"; and he cannot attend his kids' sporting events because "it is too painful to sit on the bleachers and watch them play."  Dr. Nichols noted that the claimant experienced daily symptoms of generalized anxiety; major depressive disorder, single episode but moderate; and deficits that moderately interfere with his ability to remember, understand, and carry out simple work-related functions. (R. 246-249).  Dr. Nichols also found that the claimant's prognosis for significant change in the next twelve months was poor.

Dr. Ashley Thomas, M.D., of MDSI Physician Services, performed a consultative physical examination of the claimant on March 10, 2012 at the request of Disability

Determination Services.  Dr. Thomas also reviewed the past medical records of the claimant.  He noted that the claimant appeared uncomfortable from the pain; shifted positions frequently; but could get on and off the examination table without assistance.  Dr. Thomas also noted that the claimant used a cane; walked with a limp favoring the right leg; had decreased light touch in his left hand, inside of his left calf, and left toes; and could not heel walk.  The claimant's strength was five out of five in his upper extremities and four out of five in his lower extremities.  Dr. Thomas' overall diagnoses were lumbar degenerative disc disease and lumbar radiculopathy.  (R. 332-335).

On March 22, 2012, the claimant visited Dr. Muratta for dull aching, and sometimes sharp pain, in his lower back and right leg. The claimant reported his pain was a seven out of ten and indicated that his last bilateral sacroiliac joint injection on February 6, 2012 gave him no relief. Dr. Muratta again gave him facet joint injections to attempt to reduce his pain. (R. 432).

On April 19, 2012, the claimant followed up with Dr. Muratta regarding the previous procedures. The claimant indicated that his pain had increased slightly to an eight out of ten, but that the pain level increased during activity. The claimant reported intermittent numbness in his right leg; his medications were only fifty percent effective; and he requested a transfer to Dr. Conner's office for pain management. (R. 431).

In a subsequent report to Guardian Life Insurance on May 18, 2012, Dr. Duryea noted that the claimant's limitations are severe, meaning he is "incapable of minimal (sedentary) activity (75 – 100%)."  She also indicated on the report that the claimant  was not a suitable candidate for vocational rehabilitation or physical therapy. (R. 436, 438).

In May and June, the claimant reported to Dr. Duryea that his pain level was a five and a six out of ten. (R. 326-328, 329-331). On June 2, 2012, the claimant reported to Dr. Duryea that

he passed out two weeks prior while walking to kitchen.  Dr. Duryea reduced his OxyContin prescription from 80 mg to 40 mg, but increased his OxyCodone prescription from 15 mg to 30 mg.  (R. 326).

From June 19, 2012, to August 21, 2012, the claimant saw Dr. Odeane Conner, M.D., at the Pain & Wound Care Center. Over five visits, the claimant consistently reported to Dr. Conner that his pain was a seven out of ten and that more physical activity increased his pain. The claimant reported that his medication was "okay," then "not really working," and then "not working" on three sequential visits from July to August of 2012.  (R. 266-284).

On August 16, 2012, Dr. Conner performed two MRI's of the claimant's spine. The first scan was a cervical spine MRI scan without contrast. Dr. Conner opined that the claimant had minimal to mild spondylosis, mild posterior and right posterolateral C5-C6 disc herniation, as well as less significant posterior symmetrical C4-C5 disc bulge. Dr. Conner also found focal signal changes within several scattered vertebral bodies at C2, C4, and C6. The second MRI scan was of the thoracic spine without contrast. Dr. Conner found minimal to mild diffuse spondylosis, with no disc herniation or significant disc bulge, and insignificant focal deposition. (R. 258-263).

The claimant's treatment with Dr. Conner ended on August 21, 2012, when Dr. Conner noted that he would not give the claimant a return appointment because of "rudeness" and "attitude." [4] (R. 268-280).

On August 31, 2012, the claimant returned to Dr. Duryea for MRI results. The claimant reported his pain level was an eight out of ten and he wanted to switch to Dr. Salisbury for pain management "due to cost [because] he will be without insurance after this month." At this time, the claimant took Glucosamine for joint pain, Tizandine for muscle tightness, Diazepam for pain,

---

[4] Dr. Conner's records do not indicate what the claimant said or did that reflected a rude or poor attitude.

Zolpidem Tartrate for sleep, BuPropion HCL for mood, OxyContin for chronic pain, OxyCodone for pain, Gabapentin for nerve pain, and Opana for pain. Dr. Duryea added 20 mg of Fluoxetine HCl for mood and depression and made a "pain management referral." (R. 317-319)

On September 25, 2012, the claimant visited Dr. Duryea for pain management and reported that he could not get to a pain doctor and was not taking his medications as prescribed. Dr. Duryear discontinued the prescription for Glucosamine and Opana; added 60 mg of Morphine Sulfate in place of the OxyContin; and renewed his prescription for 30 mg of oxycodone, but increased it to one tablet five times a day instead of every six hours. At the time of that visit, the claimant reported his pain level was a seven out of ten. (R. 460-462).

On October 23, 2012, the claimant visited Dr. Duryea for chronic pain and insomnia. Dr. Duryea noted that the claimant was taking his medications again as prescribed and they were effective, although the claimant reported his pain level as a seven out of ten. Dr. Duryea noted that the claimant had no insurance at that time. (R. 455-457).

On December 18, 2012, Dr. Duryea noted that the claimant was taking his medications as prescribed and they were effective, however the claimant reported that his pain level was an eight out of ten. (R. 452-454).

On that same date, on a subsequent report to Guardian Life Insurance, Dr. Duryea reported that the claimant rated his pain as high as an eight out of ten; that she felt that pain level was realistic; and that she would estimate his pain level as an eight out of ten. Dr. Duryea rated the claimant's intensity of pain as "Marked," indicating that the "pain precludes carrying out most activities of daily living. Sleep is disrupted. Recreation and socialization are impossible. Narcotic medication or invasive procedures are required and may not result in complete pain

control. Unable or unsafe to drive." She also indicated that the claimant's pain is "chronic" and that he does not have "adequate pain control with [his] prescribed medication(s)." (R. 436).

### The ALJ Hearing

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ on September 18, 2013. (R. 104, 106). The claimant testified that his back pain felt paralyzing and "locked him out," so he stopped working around 2010. The claimant stated that the pain started in his buttocks, moved into his lower back, and radiated to both of his legs. (R. 52-53).

The claimant testified that he had been in pain management, but had to stop in 2013 because he lost his insurance. The claimant testified that during treatment he had received between six and eight epidural injections for pain management, but they did not help. At one point the claimant took morphine, but it was only a little effective. The claimant testified that he was not taking any medication because he could not afford it. The claimant rated his pain as "probably an eight, seven or eight" and stated that the pain affected his concentration because he could not focus long enough to watch a two-hour movie. (R. 53-55).

The claimant stated that he could only sit for ten to fifteen minutes before needing to get up or lay down; that he tries not to stand but can sometimes do so for ten to fifteen minutes; that he can walk only about an aisle of a grocery store or two before he needs to stop to rest; and that he can lift as much as a gallon of milk. The claimant testified that he does not do any household chores, and that he reclines or lies in bed most of the day. (R. 55-57).

The claimant testified that Dr. Stevens indicated that a fusion would be an option, but that the claimant was young and would likely need around six more; that he felt his condition was

getting a little worse every year; and that he did not believe a fusion would relieve his symptoms. (R. 59-60).

The claimant used to work as a power lineman for Diversified Services moving heavy objects, such as t-brackets and metal and iron brackets. He also testified that he worked at a nursery doing mostly landscaping work, which involved pulling a hose and moving fifty pound bags of fertilizer. The claimant further testified that he had a short stint doing HVAC work that lasted only about a month. He tried to return to his lineman position, but the doctors would not release him at that time. He received around $2,630 a month from Guardian Life Insurance for disability. (R. 60-63, 68).

A vocational expert, Dr. Head, testified concerning the type and availability of jobs that the claimant could perform. Dr. Head testified that the claimant's past relevant work falls into two categories. First, the claimant's work as a lineman is classified as heavy and skilled. Second, the claimant's work at the nursery is classified as medium and semi-skilled. The short stint replacing HVACs is classified as heavy and semi-skilled. Dr. Head testified that the claimant could not return to work at these positions and that none of these skills are transferable to exertion levels below medium.

The ALJ asked Dr. Head to consider that the claimant is a younger individual, with a limited education, who can perform light work with limitations of occasional stooping and crouching; occasional lower-extremity pushing and/or pulling; and no driving.  Dr. Head testified that the claimant could perform unskilled, entry-level, light jobs, such as a simple assembler, which has 130,000 jobs nationally and 2,100 in Alabama; an unskilled cashier, which has 212,000 jobs nationally and 4,700 in Alabama; and a sorter, which has 93,000 jobs nationally and 1,850 in Alabama. Dr. Head testified that the claimant could work at a sedentary level as a

bench hand, which has 85,000 jobs nationally and 1,750 in Alabama; a telephone quote clerk, which has 65,000 jobs nationally and 1,100 in Alabama; and a surveillance system monitor, which has 68,000 jobs nationally and 1,300 statewide. Dr. Head testified further that the claimant could not do these jobs if he had to get up and alternate posture every fifteen minutes or if he could not stay focused for more than fifteen percent of the work day. (R. 69-77).

*The ALJ's Decision*

On January 23, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 43). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2015, and had not engaged in substantial gainful activity since October 31, 2010, the alleged onset date of disability. (R. 29).

Next, the ALJ found that the claimant had the severe impairments of lumbar stenosis, lumbar degenerative disc disease, lumbar facet hypertrophy, lumbar radiculopathy, neuralgia, herniated disc C5-6 on the right, cervical spondylosis, thoracic spondylosis, chronic pain syndrome, generalized anxiety disorder, major depressive disorder, specific reading disorder, and disorder of written language. (R. 29).  The ALJ also found that the claimant had the non-severe impairments of insomnia, nicotine dependence, constipation, general weakness, and anterior wall chest past pain with expiration. The ALJ found that none of the non-severe impairments significantly limit the claimant's ability to perform basic work activities and were not considered in assessing his residual functional capacity. (R. 34).

The ALJ then found that the claimant did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ determined that the claimant did not have a disorder of the spine that met or equaled the criteria of section 1.04. The ALJ found that the claimant did not show evidence of nerve root compression; limitation of motion of the spine; motor loss accompanied by sensory or reflex loss and positive straight leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudo-claudication. (R. 34).

The ALJ also determined that the claimant did not have a disabling mental condition. The ALJ explained that the claimant did not have a mental impairment or a combination of mental impairments that met or equaled the criteria for sections 12.02, 12.04, and 12.06. (R. 35).  He considered Dr. Nichol's report that the claimant's depression was only moderate; the claimant's ability to relate interpersonally and withstand the pressure of everyday work was only moderately compromised; and that the claimant had deficits that interfered with his ability to remember, understand, and carry out simple instructions. However, the ALJ noted that the claimant admitted in the hearing to being able to do repetitive everyday tasks and live independently. (R. 40).

Regarding the claimant's mental disorders and Dr. Nichols' assessment that the claimant has a GAF score of 45, the ALJ noted that the Commissioner does not endorse GAF scores for use in Social Security programs, and that the scores have no direct correlation to the assessment of the claimant's ability to work. The claimant worked for many years with depression prior to his back problems. Therefore, the ALJ afforded Dr. Nichols's opinion of the claimant's functioning capacity, as it relates to the claimant's mental state, little weight because of its inconsistency with the record. (R. 40).

The ALJ assessed the claimant's testimony using the pain standard. He considered that the claimant testified to not being able to work because of pain in his lower back, buttocks, and the back of his legs. The ALJ also considered that the claimant could not afford health insurance, which is why he stopped taking pain medication. The ALJ also considered the claimant's daily activities and noted that the claimant and his grandmother both reported that he could watch television, prepare meals, and wash dishes, as well as talk with the children on the phone daily and sometimes attend ballgames. The ALJ also noted that the claimant stated that he could do some things around the house, but that it took him a long time. (R. 36-39).

However, the ALJ determined that the claimant's alleged pain did not rise to the level of severity necessary to qualify for disability and did not last continuously for 12 months. In making this decision, the ALJ afforded the opinion of the claimant's treating physician, Dr. Duryea, little weight. He stated that her opinion that the claimant could not work was inconsistent with the record and her own medical records that showed the claimant's pain levels ranging from five to eight. The ALJ considered these levels to be non-disabling. Dr. Duryea's records also indicated that the claimant reported his medication was effective or partially effective.

The ALJ found Dr. Stevens and Dr. Faulkner's opinions more convincing because they did not report that the claimant had disabling pain or limitations, and Dr. Muratta and Dr. Conner did not indicate that they believed the claimant to be disabled. The ALJ found their findings consistent with the record as a whole.  The ALJ also considered the opinion of a non-examining state agency psychologist, Dr. Melissa F. Jackson, Ph.D., and afforded her opinion significant weight because the ALJ found it consistent with the claimant's treating medical records. (R. 39-41).

The ALJ found that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except with the limitations of occasional stooping and crouching; no climbing; only occasional lower extremity pushing and/or pulling; no driving; and only simple, repetitive, noncomplex jobs.

Based on Dr. Head's testimony, the ALJ determined that the claimant was unable to perform any past relevant work as a lineman and a nursery worker because those jobs involved heavy and medium levels of exertion, respectively.  (R. 41).

The ALJ then considered the claimant's age, limited education, and ability to communicate in English. The ALJ noted that the transferability of job skills is not material to the determination of disability because the claimant is not disabled. However, the ALJ determined that the claimant's acquired skills were not transferable below the medium level of physical exertion. (R. 41).

The ALJ determined that jobs in significant numbers in the national economy exist that the claimant could perform. After considering the claimant's residual functional capacity, age, education, work experience, and Dr. Head's testimony, the ALJ found that the claimant could find and perform work as an assembler, cashier, and sorter, and, therefore, the claimant is not disabled. (R. 41-42).

## VI. DISCUSSION

### I.  Weight Given to the Treating Physician

The claimant argues that substantial evidence in the record does not support the ALJ's reasons for giving his treating physician Dr. Duryea's opinion less than significant weight. The court agrees and finds that substantial evidence does not support the ALJ's decision to discredit Dr. Duryea's opinion that the claimant has debilitating pain.

Unless the ALJ has good cause, he should give the opinion of the claimant's treating physician considerable weight. *Crawford*, 363 F.3d at 1159. If substantial evidence does not support the ALJ's reasons for giving a treating physician less than significant weight, the ALJ commits reversible error. *Moore*, 405 F.3d at 1212.

The ALJ only presents two reasons for giving the claimant's treating physician Dr. Duryea's opinion little weight. The ALJ noted that Dr. Duryea's treatment records indicate multiple occasions where the claimant reported his pain level was a five and improving, and that his pain medications were effective. Second, the ALJ articulated that Dr. Muratta's records indicate the claimant's condition was improving.  However, neither reason constitutes substantial evidence for discrediting the treating physician's opinion.

The ALJ mischaracterizes the evidence by pointing to just a handful of pain levels reported by the claimant ranging from five to six and concluding that evidence totally negates Dr. Duryea's opinion that the claimant experiences an eight out of ten pain level overall.  Dr. Duryea treated the claimant consistently for almost *six* years, and the ALJ should afford her opinion significant weight unless good cause exists for him failing to do so.  In this case, picking and choosing a few instances of pain levels at a five and six do not constitute good cause for discrediting the claimant's long term treating physician's opinion.

The ALJ references Dr. Duryea's treatment notes where the claimant on a few occasions reported five out of ten and six out of ten pain levels to discredit her medical opinion that the claimant's pain level is realistically an eight out of ten. (R. 39, 233-236, 339-341).  However, the record also shows that, prior to and following Dr. Duryea's opinion that the claimant's realistic pain level was an eight out of ten, the claimant reported a ten out of ten pain level on one occasion; a nine pain level on one occasion; an eight out ten pain level on at least four occasions;

and a seven on at least ten occasions. (R. 268-280, 317-319, 431-433, 452-454, 460-462).

Moreover, the ALJ fails to account for the claimant's statements that his reported pain levels *increase* with any type of activity. Each time the claimant reported a five or a six out of ten, he also indicated that his medications *with rest* helped to reduce his pain level, but that his pain level increased with any type of physical activity.  Even though the claimant took numerous medications for pain and had numerous caudal epidural steroid injections, his pain level continued to fluctuate between an occasional five to an eight out of ten, and the claimant consistently stated that his reported pain levels on that given day would increase with any physical activity.  The longitudinal record supports Dr. Duryea's opinion regarding the limiting effects of the claimant's pain levels; the ALJ picking and choosing a few reported pain levels below a seven out of ten do not eradicate her opinion as the treating physician.

Although the ALJ states that the claimant and Dr. Duryea reported that the medications were effective at times, the ALJ ignores the claimant's disclaimer that medications *and rest* reduce his pain levels, but do not alleviate the pain, and that any amount of physical activity increases his pain.  The ALJ acknowledged that the claimant's severe impairments of lumbar stenosis, lumbar degenerative disc disease, lumbar facet hypertrophy, lumbar radiculopathy, neuralgia, herniated disc C5-6 on the right, cervical spondylosis, thoracic spondylosis, and chronic pain syndrome could produce the pain at the levels reported by the claimant.  Taking into account the claimant's uncontradicted medical diagnoses regarding his back and his reported pain levels while on narcotic medications with virtually no physical activity, Dr. Duryea's opinion that the claimant has a "Marked" pain level is consistent with the medical record as a whole. With Dr. Duryea's extensive treatment history with the claimant and these supporting medical diagnoses in the claimant's longitudinal medical history, the ALJ's reference to a few

lower pain levels and failure to account for the increase in pain with any physical activity do not constitute substantial evidence to discredit the treating physician Dr. Duryea's opinion.

Moreover, the ALJ's statement regarding Dr. Muratta's records indicating that the claimant was improving is not fully accurate.  Although the claimant did have steroid injections under Dr. Muratt's care and reported some lower pain levels during that time, the claimant reported to Dr. Muratta on February 22, 2012 a six out of ten pain level, with a sharp pain that increased with any activity.  On March 7, 2012, the claimant told Dr. Nichols that his "pain meds don't work very well," and on March 22, 2012, he reported to Dr. Muratta that his pain was a seven out of ten and that the steroid injections gave him no relief.  Just a month later in April 2012, the claimant reported to Dr. Muratta that his pain level had *increased* to an eight out of ten that increased with activity.  Although the claimant reported to Dr. Duryea during May and June, 2012 that his pain level had decreased some, his pain levels began to increase again to a seven or eight out of ten from August to December 2012.  The ALJ's statement that Dr. Muratta records show that the claimant was improving contradicts medical evidence and does not constitute substantial evidence for the ALJ to discredit Dr. Duryea's medical opinion based on almost six years of treating the claimant consistently.

*Pain Standard*

The claimant also argues that substantial evidence does not support the ALJ's reasons for discrediting his subjective testimony regarding the limiting effects of his pain. The court agrees and finds that substantial evidence does not support the ALJ's credibility findings.

In this case, as discussed above, the ALJ agreed that the claimant's objective medical conditions can reasonably be expected to produce debilitating pain.  However, the ALJ pointed to the claimant's daily activities in discrediting the claimant's subjective testimony regarding the

limiting effects of his pain. *See Harwell*, 735 F.2d 1292 (an ALJ can cite the claimant's daily activities to discredit his subjective testimony regarding the limiting effects of his pain). The ALJ must give specific and adequate reasons when discrediting the claimant's pain, or the court must accept the testimony as true. *Foote*, 67 F.3d at 1561-62. The ALJ's reasons in this case were inadequate.

The ALJ, in assessing the claimant's daily activities to discredit his pain testimony, pointed out that "[a]lthough the claimant and his grandmother have reported that his daily activities are significantly restricted, he has admitted to watching television, preparing his meals, and washing dishes, as well as talking with his children on the telephone daily and sometimes attending ballgames." (R. 39). The ALJ also stated that the claimant admitted to Dr. Thomas that "he was able to do some things around the house, although it took a long time" and that he was "independent with his activities of daily living, ambulation, and transfers, with the exception of some difficulty putting on his socks." The ALJ concluded that the "record as a whole does not establish that the claimant's activities should be so limited as he has reported." (R. 39-40).

The ALJ mischaracterizes the claimant's daily activities and misconstrues how those activities contradict the claimant's allegations regarding his pain. The ALJ opines that, because the claimant can do a few things around the house and watch television, he is not as limited as he reported. However, the activities noted by the ALJ do not involve a great deal of physical activity and do not contradict the claimant's testimony regarding the limiting effects of his pain. Microwaving food, cleaning off a plate, talking on the phone, and watching television are inherently low-level activities that, by themselves, do not substantiate finding the claimant's testimony about his pain not credible. Also, attending a daughter's basketball game one time a month does not equate to having no disabling pain. Moreover, the claimant testified that any

physical activity increases his pain level, and these activities do not require the claimant to exert much, if any, physical activity.  This court finds that substantial evidence does not support the ALJ's reasons for discrediting the claimant's subjective pain testimony based on his daily activities.

The ALJ also points out that Dr. Stevens did not report that the claimant had disabling back pain. (R. 38). Dr. Stevens does not directly state that the claimant's pain is disabling or limiting, but his assessment reflects considerable precautions about the claimant's health. Dr. Stevens recommended that the claimant seek treatment with a spine interventionist and advised against surgery without exhausting all other options because the operation is "morbid" and would "change his back forever." (R. 215). Furthermore, the ALJ does not refute that Dr. Stevens told the claimant to find another line of work, which certainly indicates limitations on the claimant's ability to work and contradicts the ALJ's conclusion that Dr. Stevens never placed *any* limitations on the claimant.

The court is also troubled by the fact that, to discredit the claimant's subjective testimony about his pain, the ALJ pointed to the claimant's failure to take his pain medication.  The ALJ stated that "although [the claimant] testified that he had no health insurance and could not afford treatment or medications, it is not credible that a person experiencing the severe level of pain alleged by the claimant at the hearing would fail to seek any medical treatment or take any medication for his pain for nearly a year." (R. 39).  The ALJ acknowledged that the claimant testified that he could not afford treatment to explain the times he did not take his medications, but does not take that inability to afford treatment into account when assessing the claimant's credibility. The court also is unclear about what "year" to which the ALJ refers, as the record reflects that the claimant consistently sought treatment for his pain from October 2010 through

December 2012, and did not take his medications as prescribed only during September and October 2012 and when he could not afford it and had no insurance.  The ALJ failed to inquire as to whether the claimant truly could not afford his treatment during that time, and should not base his discrediting of the claimant on the claimant's noncompliance with his medication regimen if he truly could not afford his medications.

The court finds that substantial evidence does not support the ALJ's failure to give Dr. Duryea's opinion substantial weight nor his credibility finding regarding the claimant's limiting effects of his pain.

### VII. CONCLUSION

For the reasons stated above, the court concludes that substantial evidence does not support the ALJ's discrediting of the claimant's treating physician and pain testimony. Accordingly, the court REVERSES and REMANDS the decision of the Commissioner.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 9th day of September, 2016.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE